UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
DAMIEN ADAMS,

                                  Petitioner,

            v.

DALE ARTUS, and THE ATTORNEY GENERAL
OF NEW YORK,

                             Respondents.
-----------------------------------------------------------------x

**REPORT AND**
**RECOMMENDATION**
09-CV-1941 (SLT) (VVP)

POHORELSKY, Magistrate Judge:

      The petitioner, Damien Adams, brings this *pro se* petition for a writ of habeas corpus

("Petition") pursuant to 28 U.S.C. § 2254. Adams is currently serving a prison sentence of 22 years,

having been convicted of first-degree manslaughter on February 22, 2006, following a jury trial in

Supreme Court, Kings County.[1] Adams challenges his conviction on the grounds that (1) the trial

court's legal instructions to the jury on justification improperly limited the scope of his defense and

therefore violated his due process rights; (2) the 22-year sentence is excessive in light of his minimal

criminal record and difficult upbringing; (3) the prosecution's summation comments in vouching

for the credibility of its eyewitnesses deprived him of a fair trial; and (4) he was denied effective

assistance of counsel when his attorney failed to object to the prosecutor's closing argument. Adams

subsequently moved to amend his Petition to add an ineffective assistance of appellate counsel

claim. Judge Townes has referred the matter to me for a report and recommendation. For the

reasons that follow, I respectfully recommend that the petition and the motion to amend be denied.

---

[1] At trial, Adams was acquitted of murder in the second degree. (Tr. at 494). "Tr." refers to transcripts of the trial.

# I.    FACTUAL AND PROCEDURAL BACKGROUND

The facts arise from a gang-related shooting that occurred on October 26, 2004 in Brooklyn. At approximately 10:00 p.m., a group of young men were talking on the corner of Nostrand Avenue and Crown Street in the Crown Heights neighborhood. (Tr. at 227-28). Among them was the victim of the shooting, 17-year-old Serge Augustin Jr., as well as several eyewitnesses, including Stevenson Jules, Jeffrey Malivert, Makendi McKenzie Duchatelier, and Timothy Gladney. (Tr. at 228). Adams approached them while pushing his cousin Mike in a wheelchair, and stopped approximately six or seven feet away from the group. (Tr. at 231-32).

Adams asked Augustin, who was wearing a blue bandana in his back left pocket, if he was a member of the "Crip" street gang, which associates itself with the color blue. (Tr. at 116, 232-33). Augustin replied that he was not a Crip, but that he was a Folk, a different street gang. (Tr. at 77, 232). Adams asked why, in that case, would Augustin be wearing a blue bandana, to which Augustin replied, "What you mean am I a Crip?," and pulled up his pants. (Tr. at 233, 326). Adams then pulled out a gun and again inquired of Augustin whether he was a Crip.[2] (Tr. at 234, 326-27). Duchatelier told Adams, "Ain't no need for all this. Ain't no need to pull out a gun and act stupid." (Tr. at 327). Standing approximately two feet from Augustin, Adams shot Augustin first in the leg and then in the stomach, firing three or four shots. (Tr. at 236-238, 327-329). Augustin later died from his wounds. (Tr. at 205).

On the basis of information Gladney provided to the police, Adams was arrested on February 26, 2005. (Tr. at 243-45, 275-277, 381). After being asked what occurred on October 26,

---

[2] Duchatelier's account of how the altercation began differed slightly. According to Duchatelier, he was with Augustin and Malivert approximately fifteen feet away when Adams asked Jules if he was "going to choose these guys over me." Adams then began to walk away, but then turned around, approached Augustin and, when six inches away, asked Augustin if he was a Crip. (Tr. at 321-25).

2004, Adams wrote, "I do drugs that make me get out of control and cannot remember." (Tr. at 385-86). Gladney identified Adams in a lineup, and once Adams learned that a witness had identified him as Augustin's shooter, he gave two subsequent written statements. (Tr. at 387-95). In these statements, which essentially mirror each other, Adams wrote that he knew that Augustin and his friends wanted to kill Adams because he did not "support them and their habits." (Tr. at 392). Adams wrote that on the night of the shooting, he was intoxicated and went with Augustin and his friends to get high. (Tr. at 392). The group told Adams and his cousin to "get down or lay down" and Adams replied that "family comes first."[3] (Tr. at 392, 394). According to Adams' written statements, Jules punched the petitioner on the back of the head and another member of the group, Gladimir Thomas, brandished his gun. (Tr. at 393-94). Adams wrote that he seized control of the gun from Thomas, and that as others were exiting an adjacent building, he told everyone to "backup" or "nobody move." (Tr. at 393, 395). Adams recalled that he became scared and nervous and shot someone in the leg. *Id.* Adams claimed in his second statement that he fired two shots by mistake. *Id.*

Adams was tried in February 2006 for second-degree murder, first-degree manslaughter, and well as criminal possession of a weapon in the second and third degrees. He did not testify and the defense did not present any witnesses. (Tr. at 411-12). Both Gladney and Duchatelier testified, and the prosecution invited the jury in summations to consider that Gladney and Duchatelier no longer lived in the neighborhood where the shooting occurred, no longer see the people involved, and that they identified Adams in court as having shot Augustin. (Tr. at 438-39). The prosecution argued

---

[3] The defense argued that "get down or lay down" means "either you're joining us [our gang], or you're going to be dead." (Tr. at 428).

that Gladney's courage in coming forward and testifying against Adams thus buttressed his credibility, also pointing out that the witnesses who still lived in that neighborhood, Jules and Malivert, both claimed to have no recollection of the events.[4] (Tr. at 440-46). Adams objected to these remarks on three different occasions, but the objections were overruled. (Tr. at 439, 442). The judge instructed the jury on the concept of justification, and neither the prosecution nor the defense objected to the charge. (Tr. at 468-73, 483).

The jury acquitted Adams of the murder charge, but convicted him of first-degree manslaughter, and he was sentenced to 22 years imprisonment. (Tr. at 494).[5] On direct appeal, Adams raised through his attorney the issue of the court's justification charge, trial counsel's ineffectiveness for failing to object to the justification instructions, and the excessiveness of the sentence. He also filed a *pro se* supplemental brief, arguing that various comments in the prosecution's summation deprived him of a fair trial, and a related ineffective assistance of counsel claim. In October 2008, the Appellate Division affirmed defendant's conviction, finding that the justification claim and his summation claims were unpreserved for appellate review and ultimately without merit, and that the sentence was not excessive. *See People v. Adams,* 55 A.D. 3d 616, 867 N.Y.S.2d 450 (2d Dep't 2008). In November 2008, Adams sought leave to appeal all claims raised on direct appeal, but the Court of Appeals denied that application in December 2008. *See People v. Adams*, 11 N.Y.3d 895, 901 N.E.2d 765 (2008). The petitioner filed the instant *pro se* petition

_____

[4] Jules testified that he was in a coma and could not remember what happened, but after being reminded that he was under oath, he testified that while he was nearby at the time of the shooting, he did not see anything and only heard the shots. (Tr. at 178, 189). Similarly, Malivert initially claimed to have no recollection of the night in question, but then reluctantly testified only that he was nearby and heard the shooting. (Tr. at 286, 290, 298).

[5] The jury was not required to reach a verdict on the weapons charge in the event it convicted the petitioner on either homicide charge. (Tr. at 476-77).

for habeas corpus on April 24, 2009. The court thereafter granted the petitioner's request to hold the petition in abeyance so that he could file a *coram nobis* application in the Appellate Division raising a claim of ineffective assistance of appellate counsel. On November 4, 2009, the Appellate Division denied the petitioner's *coram nobis* application. *People v. Adams*, 67 A.D.3d 695, 886 N.Y.S.2d 897 (2009). The respondent sent the petitioner a copy of that decision on November 20, 2010. Aff. in Opp. to Amended Pet., May 3, 2010, ¶12 (Dkt No. 10). The petitioner thereafter sought to amend his petition for habeas corpus to add a claim identical to that raised in his *coram nobis* application.

As the petition for habeas corpus was brought in this court in June 2009, it is timely under the one-year statute of limitations. 28 U.S.C. § 2244(d)(1). Adams raised all the issues for which he seeks collateral review in his Petition on direct appeal and has exhausted the remedies available to him in state court as to those claims. *See* 28 U.S.C. § 2254(b)(1).

## II.     DISCUSSION

### A.     Legal Standards

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") authorizes federal courts to "entertain" habeas petitions "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The AEDPA severely narrowed the circumstances under which federal courts may grant a habeas petition by imposing a more deferential standard of review for habeas claims that have been adjudicated on the merits in state courts. *See* 28 U.S.C. § 2254(d); *Eze v. Senkowski*, 321 F.3d 110, 120 (2d Cir. 2003); *Schulz v. Marshall*, 529 F. Supp. 2d 77, 89 (E.D.N.Y. 2007). A federal court may grant a petition on a claim that was adjudicated on the merits in State court only if that decision

(1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); *see also Williams v. Taylor*, 529 U.S. 362, 402-13 (2000). "A state court adjudicates a claim 'on the merits' for purposes of § 2254(d) when it '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment . . . . even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.'" *Serrano v. Fischer*, 412 F.3d 292, 296 (2d Cir. 2005); *Williams v. Spitzer*, 246 F. Supp. 2d 368, 379 (S.D.N.Y. 2003).

A state court decision is "contrary to" clearly established federal law if it "arrives at a conclusion opposite to that reached by the [Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413. Alternatively, the state court decision is an "unreasonable application" of clearly established federal law if it "correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor*, 529 U.S. at 407-08). The "unreasonable application" inquiry focuses on whether the state court application of clearly established federal law is "objectively unreasonable," as opposed to whether it is merely "incorrect" or "erroneous."[6] *See Bell*, 535 U.S. at 694 (citing *Williams v. Taylor*, 529 U.S. at 409-

---

[6] As long as the state court application of clearly established federal law was not *unreasonable*, an application that was incorrect or erroneous would not warrant habeas relief. The Supreme Court has recently reinforced this distinction: "Whether or not the Michigan Supreme Court's opinion reinstating [the petitioner's] conviction was *correct*, it was clearly *not unreasonable*." *Renico*, 130 S. Ct. at 1866. There is authority in this Circuit, however, for first determining whether the state court application was erroneous, and then, if not incorrect, denying the petition on that basis – since the "correct" application will not be unreasonable. *See Kruelski v. Connecticut Superior Court for the Judicial Dist. of Danbury*, 316 F.3d 103, 106 (2d Cir. 2003); *see also Jodhan v. Ercole*, No. 07-CV-9263, 2008 WL 819311 at *4

10); *see also Renico v. Lett*, 130 S. Ct. 1855, 1865 (2010) (reversing grant of habeas petition because state court determination, "while not necessarily correct – was not objectively unreasonable."); *Eze*, 321 F.3d at 125. Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. at 412; *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004); *cf. Carey v. Musladin*, 549 U.S. 70, 78-79 (2006) (Stevens, J., concurring). In other words, courts look to the "governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

Lastly, before turning to the specifics of Adams's claims, federal district courts may not grant a habeas petition if the state court determination provides an independent basis under state law for denying the federal claim that adequately supports the result. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991); *see also Harris v. Reed*, 489 U.S. 255, 262 (1989); *Wainwright v. Sykes*, 433 U.S. 72, 81-82 (1977). In such circumstances, the claim is considered procedurally barred or procedurally defaulted as a result of the state court determination on state law grounds. The petitioner can only circumvent the procedural default if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *see also Harris*, 489 U.S. at 262; *Wainwright*, 433 U.S. at 81-82.

---

n.6 (S.D.N.Y. Mar. 28, 2008). If the claim thus fails under the simpler and "less deferential pre-AEDPA standard," there is less of a need to proceed onto the more "intricate" AEDPA standard. *See Jodhan*, 2008 WL 819311, at *4 n.6.

**B.     Analysis of the Petition**

The claims Adams raises in his Petition relate to the jury instructions, the length of the sentence, the prosecutor's summation, and the effectiveness of assistance of counsel. All of the claims are procedurally barred, without merit, or both.  The court will address each in turn.

**1.  Jury Instruction**

The petitioner first argues that the court's charge to the jury improperly limited his justification defense.  Specifically, he contends that the instructions did not allow the jury to consider the actions of Augustin's companions (which include, according to his testimony, punching and threatening Adams with a gun) when determining the reasonableness of Adams' belief that he was in imminent danger.  After explaining the concept of justification generally, the judge instructed, "First, the defendant must have actually believed that the decedent, Serge Augustin, was using or about to use deadly physical force against him and that the defendant's own use of deadly physical force was necessary to defend himself from the use of deadly physical force against him." (Tr. at 469).  The judge again referred to Augustin when instructing the jury that Adams must have believed "that it was necessary to defend himself from what he honestly believed to be the use of or the imminent use of deadly physical force by the decedent and that a reasonable person in the defendant's position, knowing what the defendant knew or being in the same circumstance, would have also believed that deadly physical force was necessary in that situation."[7] (Tr. at 469).  Adams described in his written statements how Jules, a companion of Augustin, had punched him in the back of the head and how Thomas brandished a gun.  (Tr. at 393-94).  The petitioner thus contends

_____

[7] The judge also instructed that if Adams believed he needed to use force "to defend himself from what he reasonably believed to be the use or imminent use of such force by the decedent, it doesn't matter whether the defendant was or may have been mistaken . . . provided that his belief was both honestly held and reasonable."  (Tr. at 470).

that because the instructions referred to the threat posed by Augustin alone, and not by any other members of the group, the court improperly limited his justification defense.

The Appellate Division found this claim unpreserved for appellate review, and, in any event, without merit. *Adams*, 55 A.D.3d at 616. The court held that the claim was waived because defense counsel did not object to the charge when it was given. Indeed, defense counsel stated that he had no objection to the charge as given. (Tr. at 483). Under New York Law, to be preserved on appeal, a defendant must object to jury instructions that are given at the time or at a subsequent time when the court has an opportunity to amend the instruction. N.Y. Crim. Proc. Law § 470.05(2). "Because the defendant did not object to the charge as delivered or request supplemental instructions . . . he failed to preserve the issue for appellate review as a matter of law." *People v. Noor*, 177 A.D.2d 517 (2d Dep't 1991); *see also Felder v. Goord*, 564 F. Supp. 2d 201, 222-24 (S.D.N.Y. 2008) (dismissing habeas claim premised on improper jury instruction because of failure to object and satisfy contemporaneous objection rule). It is well-established that the "contemporaneous objection" rule in Section 470 is adequate under New York law. *See, e.g.*, *Gonzalez v. Cunningham*, 670 F. Supp. 2d 254, 260-61 (S.D.N.Y. 2009); *Yara v. Ercole*, 558 F. Supp. 2d 329, 336-38 (E.D.N.Y. 2008). As the ruling of the Appellate Division constitutes an "independent and adequate" basis under state law to reject the claim, it is procedurally barred, and habeas relief is available only if Adams can show cause for the default and actual prejudice flowing therefrom, which he cannot do.[8] *See Coleman,* 501 U.S. at 729-30.

---

[8] Adams is not pursuing an ineffective assistance of counsel claim before this court based on trial counsel's failure to object to the justification charge.

However, even if the jury instruction claim was not procedurally barred, it is without merit in any case. To prevail on a habeas claim predicated on an erroneous jury instruction, the petitioner must establish that the "error violated a right guaranteed to him by federal law." *Blazic v. Henderson*, 900 F.2d 534, 540 (2d Cir. 1990); *Casillas v. Scully*, 769 F.2d 60, 63 (2d Cir. 1985). Thus, even if the charge in question violated state law or incorrectly stated state law, it would still not give rise to habeas relief unless some constitutional right was infringed. *Id.* Put differently, the defective instruction must have "so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Estelle v. McGuire*, 502 U.S. 62, 72 (1991). When determining any due process violation, courts review the instructions as a whole instead of divorcing any single instruction from the entire charge. *See Cupp*, 414 U.S. at 146-147; *see also Middleton v. McNeil,* 541 U.S. 433, 437 (2004) (quoting *Boyde v. California*, 494 U.S. 370, 378 (1990)).

In this case, the charge as a whole conveyed the accurate legal standard for justification, despite singling out Augustin. In New York, one may not use deadly physical force unless he "reasonably believes such to be necessary to defend himself" and he "reasonably believes that such other person is using or about to use deadly physical force."[9] McKinney's Penal Law § 35.15(2)(a). The "reasonable belief" component consists of a subjective and objective element, and allows jurors to examine the totality of circumstances, including "evidence of prior acts committed by the victim of which the defendant had knowledge, the physical characteristics of all persons involved and the behavior of third-party aggressors acting in concert with the victim." *People v. Young,* 33 A.D.3d

---

[9]Although a violation of state law by itself is not grounds for habeas relief, the federal standard requires that the charge as a whole must deliver to the jury the correct instructions on the law.

1120, 1123, 825 N.Y.S.2d 147 (3d Dep't 2006); *see also Matter of Y.K.*, 87 N.Y.2d 430, 434 (1996); *People v. Goetz*, 68 N.Y.2d 96, 114 (1986). Therefore, "the fact that a defendant's conduct was directed at a particular attacker does not preclude the jury from considering the conduct of third-party aggressors involved in the altercation in determining whether a defendant reasonably believed that he or she was being subjected to deadly physical force." *Young*, 33 A.D.3d at 1123; (finding justification instructions erroneous when they precluded the jury from considering all circumstances); *see also Matter of Y.K.,* 87 N.Y.2d at 434.

When instructing the jury to determine whether Adams reasonably believed he needed to use physical force, the court on three occasions referred to the use of deadly physical force by Augustin, or "the decedent." (Tr. at 469-70). Even so, taken as a whole, the instruction conveyed the correct legal standard to the jury. The charge asked the jury to consider whether, "a reasonable person in the defendant's position, knowing what the defendant knew and being in the same circumstances, would have felt the same way." (Tr. at 469). This instruction allowed the jury to consider the totality of circumstances facing Adams and did not specifically instruct the jury to exclude the actions of third parties, including whether Adams had been threatened or hit on the head. Further, the instruction allowed the jury to consider what Adams knew about the history, gang membership, or physical characteristics of all those present. The written statements Adams made were put into evidence, and they describe how Adams knew the group wanted to kill him, that Jules punched him and Thomas had a gun. (Tr. at 391-395). This evidence was again brought to the jury's attention during the defense's summation when counsel argued, without objection, that the presence and actions of Augustine's companions need be considered. He argued there were "five hostile people, one of whom had already punched him" and "you see somebody out of the corner of your eyes,

somebody pulling a gun, you don't have time to retreat. You act instantly." (Tr. at 429). It is reasonable to conclude that the jury considered this evidence when determining whether Adams's belief was reasonable. Similarly, remarks by the prosecutor did not instruct the jurors to limit their consideration to the threat presented exclusively by Augustin. If anything, the prosecutor encouraged jurors to consider all circumstances facing Adams when instructing, "The question for you is what happened and what was going on through Mr. Adams' head when this happened . . . the only thing for you to take into consideration is what he was thinking at the time he pulled the trigger." (Tr. at 451). Therefore, although the instruction specifically named Augustin, the charge taken as a whole, and the instructions and comments given to the jury as a whole, accurately conveyed the correct legal standard because they did not limit the jury's ability to consider the totality of circumstances that confronted Adams.

Still, even if the instructions were to be viewed as erroneous, no error of a constitutional magnitude has occurred. The instructions were not so deficient as to infect the entire trial and result in a violation of Adams's due process rights. Errors in jury instructions that have reached the level of constitutional infringement include omitting an element of the offense, which has the same effect as relieving the government of its burden of proof. *See United States v. Gallerani*, 68 F.3d 611, 617-618 (2d Cir.1995) (finding jury instructions that failed to identify the objects of the conspiracy alleged in the indictment a violation of due process). *See also Henderson v. Kibbe*, 431 U.S. 145, 157 (1977) ("Even if we were to make the unlikely assumption that the jury might have reached a different verdict pursuant to an additional instruction, that possibility is too speculative to justify the conclusion that constitutional error was committed.").

The instructions in question, even if considered in error, are not of sufficient gravity to entitle Adams to habeas relief. Review of the transcripts indicates that, even with a version of instructions that did not single out Augustin, the trial would still have yielded a guilty verdict. Two witnesses testified that Adams was the aggressor – approaching the group and demanding to know whether Augustin was Crip – and that Adams was the one who pulled out a gun. They both described how Adams shot Augustin twice, first in the leg and then in the stomach. (Tr. at 236-238, 327-338). Only Adams' second and third written statements gave a different version of events where the group acted as aggressors, with Jules punching him in the head and Thomas brandishing a gun. (Tr. at 392-95). Even in that version of events, however, Adams took the gun from Jules and thus became the only one armed. By all accounts, then, Adams shot an unarmed Augustin two times.

Even if one were to accept Adams' version of events in its entirety, he would not have established a viable justification defense. Under New York law, one cannot use deadly physical force if the actor "knows that with complete personal safety, to oneself and others he or she may avoid the necessity of doing so by retreating." N.Y.P.L. 35.15(2)(a). Here, Adams's own description of the events established that he was able to retreat. By his account, he took the gun from Jules, becoming the only armed person, and told the group to "nobody move" or "backup." (Tr. at 393, 395). In addition, he then describes being able to run away after he fired the first shot, but still fired two additional shots backward. (Tr. at 395). That conduct wholly undercuts any justification defense.

In view of the overwhelming evidence of guilt, and Adams's own testimony about his ability to retreat, it is unlikely a different justification charge would have resulted in a contrary verdict.

Therefore, the instructions given, even if deemed erroneous, do not rise to the level of a constitutional violation.

## 2. Excessive Sentence

Adams next contends that the imposition of a twenty-two year sentence was excessive in light of his youth, his minimal criminal record, and his tragic family upbringing. The twenty-two year sentence for first degree manslaughter conviction falls within the statutory range for the offense, which is five to twenty-five years. N.Y. Penal Law § 70.02(3)(a). If a sentence is within the range prescribed by state law, a challenge to the length of that sentence does not present a constitutional issue for federal habeas relief. *See Ross v. Gavin*, 101 F.3d 687, 1996 WL 346669, at *1 (2d Cir. 1996) (citing *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992)). Therefore, because the sentence here falls within statutory range for first-degree manslaughter, it does not trigger Eighth Amendment protections against cruel and unusual, or excessive punishment. Furthermore, given the gravity of the crime, the sentence does not offend proportionality principles in Eighth Amendment jurisprudence. *See Graham v. Florida*, 130 S. Ct. 2011, 2026 (2010); *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008).

## 3. Prosecution's Summation

Adams next argues that a series of improper comments in the prosecutor's summation deprived him of a fair trial. He contends that the prosecutor (1) improperly vouched for the credibility of two eye-witnesses, (2) improperly suggested that a witness was exposing himself to danger by testifying, and (3) mischaracterized evidence by suggesting that Gladney voluntarily testified when he was, in fact, under subpoena. The Appellate Division found these claims unpreserved for appellate review and without merit, though it did not indicate how it arrived at that

conclusion.  *Adams*, 55 A.D.3d at 616-17.  On three occasions, defense counsel objected to the prosecutor's comments.  (Tr. at 439, 442).  Since the Appellate Division provided little guidance, the court infers that the Appellate Division reached this conclusion because it found that Adams' attorney was not sufficiently specific in his objections.  Counsel twice only stated, "Objection," and once specified, "Speculative." (Tr. at 439, 442).  Therefore, these objections did not likely meet the specificity required to be preserved on appeal under New York's preservation rule.  N.Y. Crim. Pro. 470.05(2) (to preserve a specific claim on appeal, a general objection is not sufficient as it does not alert the court to defendant's position and focus on the alleged error).

However, regardless of the procedural posture, these claims fail on the merits.  The prosecutor's comments during summation did not deprive Adams of a fair trial.  To reach the level of a due process violation, the prosecutor's comments must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  Remarks that are merely "undesirable" or "universally condemned" do not clear this hurdle.  *Id*.  "It is a 'rare case' in which improper comments in a prosecutor's summation are so prejudicial that a new trial is required." *United States v. Rodriguez*, 968 F.2d 130, 142 (2d Cir. 1992) (citing *Floyd v. Meachum*, 907 F.2d 347, 348 (2d Cir. 1990)).  Indeed, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone," *United States v. Young*, 470 U.S. 1, 11 (1985).  Rather, the court must examine the alleged misconduct in the context of the entire trial to determine whether the comments "were sufficiently prejudicial to violate respondent's due process rights." *Donnelly*, 416 U.S. at 639.  That analysis focuses on three factors:  the severity of the misconduct, the curative measures taken, and the

likelihood of conviction absent the misconduct. *United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002).

Here, the misconduct, if any, during the prosecutor's summation was not severe. While it is well-established that the counsel may not vouch for its witnesses' credibility, none of these comments qualify as improper vouching. Vouching can taint a trial by suggesting there exists additional evidence known to the prosecutor but not introduced at trial, or may encourage the jury to credit the prosecutor's view of the evidence over its own. *See Young*, 470 U.S. at 18-19; *Berger v. United States*, 295 U.S. 78, 87-88 (1935); *United States v. Newton*, 369 F.3d 659, 681-82 (2d Cir. 2004); *United States v. Modica,* 663 F.2d 1173, 1178 (2d Cir. 1981) (finding improper prosecutor's assertions of "I'm here to tell you" that testimony was truthful). In contrast, it is proper for a prosecutor to "submit" credibility conclusions to the jury and ask the jury to consider whether the witnesses had a motive to lie. *See United States v. Perez*, 144 F.3d 204, 210-211 (2d Cir. 1998). Still, not all credibility conclusions need to be framed as 'submissions' to be proper. *Newton*, 369 F.3d at 682 (finding that prosecutor's comments of, "[t]hey came in here and told . . . the truth" and [t]hese are credible witnesses" did not constitute improper vouching). In addition, a prosecutor may ask the jury to consider the motives a witness may have to lie or tell the truth. *See United States v. Resto*, 824 F.2d 210, 212 (2d Cir. 1987).

The prosecutor did not improperly vouch for witnesses Gladney and Duchatelier. The prosecutor asked jurors to "think about" where all the witnesses live when considering their testimony. (Tr. at 438-39). Essentially, counsel was insinuating that Gladney and Duchatelier were more credible because they no longer "see those people [who live in that neighborhood where the shooting occurred] anymore." (Tr. at 439). He asked jurors to use their common sense when

considering testimony from Jules and Malivert, who still live in the neighborhood and claimed not to remember the events of the night in question. (Tr. at 439). Counsel instructed, "keep in mind your common sense about what happens when a witness has to come in and tell a story in front of people they know and then have to go back into that neighborhood." (Tr. at 439-40). This was not an instance of counsel improperly vouching, but rather of counsel highlighting for the jury that Jules and Malivert may have a motive not to testify truthfully. In these comments, counsel did not insert his personal beliefs to the jury or directly tell the jury what to believe. Instead, counsel was submitting to the jury the fact that Gladney and Duchatelier no longer live in the neighborhood as a reason the jury should credit their testimony over the testimony of Jules and Malivert.

In addition, prosecutors have more latitude to comment on the credibility of their witnesses when the defense has attacked that credibility. *Perez*, 144 F.3d at 210; *see also United States v. Perry*, 643 F.2d 38, 51 (2d. Cir 1981). In the defense summation, counsel argued that prosecution "relied heavily" on Gladney and Duchatelier's testimony and told the jury to remember that those witnesses were gang members. "Now let's understand one thing. The people involved in this situation were gang members. Regardless of what they might say, they were gang members" (Tr. at 423) and "The People, the prosecution, are asking you to convict him based on the testimony of other gang members[.]" (Tr. at 431). The prosecution's comments about Gladney, then, appear to be a reasonable response to the defense's attack on their credibility. Prosecution asked, "What gang members hold the same job for eight or nine years helping disabled adults? What gang members come in and testify and point the finger at somebody? You know what gang members do. They come into court, and they say I don't remember anything. I was in coma." (Tr. at 442). Similarly, when discussing McKenzie's testimony, he asked jurors to look to McKenzie's background, such

as his clean criminal record, and the fact that he now lives out of state and flew in only to testify. (Tr. at 444-45).  All of these comments were a fair response to the defense's summation.

As to the second and third objections to the summation, there was no impropriety in asking the jurors to consider whether Gladney was helping or hurting his life by testifying or suggesting that he testified voluntarily rather than pursuant to a subpoena.  Examples of prosecutorial misconduct in summations include those that appeal to the jury's passions and emotions or suggest the jury should fear the defendant.  *See United States v. Barlin*, 686 F.2d 81, 93 (2d Cir. 1982) (improper to argue that this is "the one occasion on which you have a duty to do something about the drug traffic in our community."); *United States v. Locascio*, 6 F.3d 924, 946 (2d Cir. 1993) (inappropriate to tell jurors they would be "less than human, if [they] didn't feel some personal concern").  The comments the prosecutor made here, however, were substantially less egregious. The counsel told the jury to consider what Gladney has "been through in this case, what he had to do before he came to court, when you decide whether he's telling the truth or not."  (Tr. at 443). Counsel also asked jurors to consider whether Gladney's participation in the case helped or hurt his life, and to remember that Gladney spoke to the police the night of the crime, testified five to six times before the trial, and at trial.  He told the jury to think about the courage it must have taken Gladney to come forward with information and that he moved out of the neighborhood because he was scared.  Counsel asked, "Which of you would like to be a witness in a homicide trial?"  (Tr. at 443).  None of these comments were inappropriate emotional appeals that demonized the defendant. Counsel did not suggest the jurors, or Gladney, should be afraid of Adams.  Asking the jurors to consider whether the witness helped or hurt his life seemed to allude to the inconvenience Gladney faced by having to testify several times.  Further, counsel explained that Gladney came forward the

night of the crime and subsequently testified numerous times. This was not mischaracterizing evidence by suggesting Gladney voluntarily appeared at trial, but rather explained the burden that testifying had placed upon Gladney.

Nonetheless, even if the comments in question were viewed as improper or excessive, the comments did not so infect the trial with unfairness that Adams was deprived of his constitutional rights. The Second Circuit has "repeatedly stated that the severity of the misconduct is mitigated if the misconduct is an aberration in an otherwise fair proceeding." *Elias*, 285 F.3d at 191. A trial containing only "a few brief sentences" during the prosecutor's summation did not deprive petitioner of a fair trial. *Donnelly*, 416 U.S. at 647 (prosecutor's suggestions that petitioner had sought to bargain for a lesser charge did not render the trial unfair). *See also Darden v. Wainwright*, 477 U.S. 168, 179-82 (although condemned, prosecutor's closing argument calling the defendant an "animal" and making emotional appeals still did not render the trial unfair). On the other hand, a prosecutor's use of information he knows to be false to describe evidence would be a violation of due process. *Miller v. Pate*, 386 U.S. 1, 7 (1967) ("Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence"). *See also Floyd,* 907 F.2d at 353-57 (defendant deprived of a fair trial because of prosecutorial misconduct from beginning to end, such as calling defendant a liar 40 times and distorting the burden of proof during summation). If the misconduct is not severe, the curative measures taken need not be substantial. *Newton*, 369 F.3d at 682 n.12 ("At any rate, the error, if there was any, was hardly severe and was effectively cured by the district court's charge, which instructed jurors [to use the same standards for determining the credibility of civilian and law enforcement witnesses.]").

The comments cited by Adams were isolated events that occurred only during summation; there was no repeated misconduct that would implicate an aggregate effect on the integrity of the trial. Further, because the comments were not improper, the jury charge adequately provided a remedy by instructing, "summations of counsel are not evidence in the case. You must take the evidence from the mouths of the witnesses[.]" (Tr. at 458). Moreover, as discussed above, even without the comments, the weight of evidence against the petitioner was heavy, and it is unlikely the jury would have accepted petitioner's implausible version of events. The prosecutor's summation only pointed out the obvious, asking the jury to do what it likely would have done on its own – credit the testimony of witnesses who could remember what occurred the night of the shooting. In sum, the comments made during summation were not improper, and, regardless, did not deprive Adams of a fair trial.

### 4. Ineffective Assistance of Counsel

Adams also argues that his trial counsel's failure to object to the prosecutor's closing argument deprived him of his constitutionally protected right to effective assistance of counsel. The Sixth Amendment guarantees criminal defendants assistance of counsel; to ensure trials are fair, assistance means *effective* assistance of counsel. In order to establish a claim of constitutional ineffectiveness, Adams must satisfy the now familiar two-prong approach the Supreme Court established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, he must show (1) deficient performance by counsel and (2) prejudice resulting from the alleged deficient representation. To establish deficient performance, Adams "must show that counsel's representation fell below an objective standard of reasonableness," with reasonableness being measured by prevailing professional norms taking into account all relevant circumstances. *Id.* at 688. In this

evaluation, deference is given to counsel's performance and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. When it comes to failing to object to the prosecutor's summation, a flawless performance by defense counsel is not required. *Rickenbacker v. Warden, Auburn Correctional Facility*, 550 F.2d 62, 66, (2d Cir. 1976) ("That [defense counsel] let one [objection] slip by is not . . . sufficient to establish incompetence. The courts cannot guarantee errorless counsel[.]"). Further, the standard recognizes there exists several ways to represent a client and allows for counsel to make choices on trial strategy. *Strickland*, 466 U.S. at 689; *see also United States v. Daniels,* 558 F.2d 122, 127 (2d Cir.1996) ("The decision whether to object to an arguably improper remark or to wait and attack it in the defense summation was strictly a matter of tactics."). If the comments in question are not improper, the failure to object to such comments would not classify counsel as ineffective. *Cuevas v. Henderson*, 801 F.2d 586, 592 (2d Cir. 1986) ("The prosecutor's summation was appropriate. . .[t]herefore defense counsel's failure to object does not support a conclusion that his performance was not reasonably competent.")

Adams contends his counsel acted unreasonably by not making specific and timely objections to what he deemed to be improper vouching for the witnesses' credibility, appealing to the jury's fears, and mischaracterizing evidence. Defense counsel's objections, or failure to object, did not fall below a reasonable standard of professional assistance. On three occasions counsel presented a timely objection to the comments Adams alleges were improper, and counsel specified the grounds for the objection in one of those objections. (Tr. at 439, 442). All of the objections were overruled, likely because, as previously discussed, the comments the prosecution made were not improper. Counsel had no obligation to object to an appropriate summation. Even if the

comments during summation were considered to be of some impropriety, counsel still objected a total of four times throughout the entire summation, and is not required to perform perfectly to meet the standard of reasonableness.

In addition, Adams cannot meet the second 'prejudice' prong of the test, which requires him to demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. As discussed above, there is a minimal likelihood that the omission of the prosecutor's remarks would have resulted in a contrary verdict. It is even less likely, then, that more objections, or even more specific objections, would have brought a different result. Had defense counsel objected to the comments, or more specifically stated the grounds for the objections, he very likely would still have been overruled as the comments were not improper. Further, in the jury instructions the judge reenforced that summations are not evidence. Therefore, Adams suffered no prejudice as a result of his counsel's performance. Petitioner's ineffective assistance of counsel claim lacks merit.

### C.  Motion to Amend

The petitioner has also moved to amend his habeas petition to add an ineffective assistance of appellate counsel claim that he raised in a *coram nobis* application to the Appellate Division. He contends that appellate counsel was ineffective for failing to raise the claim that trial counsel was ineffective for failing to impeach Stevenson Jules more effectively and for failing to re-open the suppression hearing after Jules' trial testimony. The respondent opposes this motion on the grounds that the claim has not been exhausted in the New York Court of Appeals and is without merit.

A motion for leave to amend a habeas petition is governed by Rule 15 of the Federal Rules of Civil Procedure. *See* 28 U.S.C. § 2242; *Mayle v. Felix*, 545 U.S. 644, 649 (2005); *Littlejohn v.*

*Artuz*, 271 F.3d 360, 363-64 (2d Cir. 2001).  Under Rule 15, where, as here, a responsive pleading has already been filed, a pleading may be amended "only with the opposing party's written consent or the court's leave[,]" which should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Even in the habeas context, amendments are favored because they tend to facilitate a proper decision on the merits.  *See Littlejohn*, 271 F.3d at 364 ("finding that there is "nothing in AEDPA inconsistent with the application of Rule 15, which promotes consideration of all of a party's claims on the merits") (citations omitted).  This is particularly true for *pro se* petitions, which are to be construed liberally.  *See Ortiz v. Heath*, No. 10-CV-1492, 2011 WL 1331509, at *5 (E.D.N.Y. Apr. 6, 2011) (citing *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)).  The decision whether to grant leave to amend is committed to the discretion of the district court.  *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (per curiam).  "Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend."  *Lucente v. International Bus. Mach. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (citation omitted).  Undue delay, prejudice, futility of the amendment, and prior opportunities to amend the complaint, among other factors, are to be considered in determining whether leave to amend shall be granted.  *Id; Manson v. Stacescu*, 11 F.3d 1127, 1133 (2d Cir. 1993) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *Sterling v. Interlake Indus. Inc.*, 154 F.R.D. 579, 588-89 (E.D.N.Y 1994).

The court finds that the motion to amend would be futile for two reasons.  First, the petitioner has failed to exhaust his remedies in state court and there is no proper basis for giving the petitioner a stay so that he could exhaust his claims. Where a habeas petition is mixed, containing both exhausted and unexhausted claims, the petition could be stayed and held in abeyance so that the

petitioner can present his unexhausted claims to the state court and return to federal court with a perfected petition. *See Rhines v. Weber*, 544 U.S. 269, 277-78 (2005). Pursuant to N.Y. Criminal Procedure Law § 460.10(5)(a), a defendant may seek leave to appeal the Appellate Division's denial of a claim of ineffective assistance of appellate counsel to the New York Court of Appeals within thirty days from service of a copy of the adverse decision to file his leave application. *Id.* If he fails to meet this deadline, he can seek an extension by demonstrating one of the causes delineated in the statute for the failure. N.Y. Criminal Procedure Law § 460.30(1) – but he must do so within a year of his failure to meet the thirty-day deadline. The petitioner never sought to appeal his *coram nobis* application to the New York Court of Appeals and both the thirty-day and one-year deadlines have since passed. The petitioner also does not purport to provide the court with any reason for his failure to seek leave before the Court of Appeals. Therefore, even if the petitioner were allowed to return to state court, the Court of Appeals would deny his claim as untimely made, which would act as a procedural bar to this court's review.

Second, even if the petitioner's claims were exhausted, amendment would be futile because the petitioner's claim of ineffective assistance of appellate counsel is without merit. "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. §2254(b)(2); *see also Rhines*, 544 U.S. at 277 ("the district court would abuse its discretion if it were to grant a stay when [the petitioner's] unexhausted claims are plainly meritless."). In order to establish ineffective assistance of counsel, a defendant must show that he or she was deprived of "meaningful representation," *People v. Satterfield*, 66 N.Y.2d 796, 799 (1985); *People v. Baldi*, 54 N.Y.2d 137, 141-47 (1981), and that but for those errors, the result of the proceedings would have been different, *Strickland*, 466

U.S. at 694; *People v. De La Hoz*, 131 A.D.2d 154, 158, 520 N.Y.S.2d 386 (1st Dep't 1987).

Appellate counsel raised three issues on appeal, including the ineffective assistance of trial counsel claim addressed above.  Now, the petitioner asserts that his appellate counsel should also have argued that trial counsel was ineffective because he failed to cross-examine witness Stevenson Jules about inconsistent statements Jules had made to the police.  Those statements, however, were harmful to the petitioner.[10]  Appellant does not explain how trial counsel's failure to bring incriminating testimony before the jury constitutes ineffective assistance of counsel.  He would be hard pressed to do so.  Trial counsel's decision *not* to bring harmful information before the jury is a classic strategic decision that cannot provide a basis for an ineffective assistance of counsel claim.  As such, it provided no basis for appellate counsel to make an argument on appeal.  *See Evitts v. Lucey*, 469 U.S. 387, 394 (1985) (appellate attorney "need not advance *every* argument, regardless of merit, urged by the appellant") (emphasis in original).

The petitioner also contends that, in addition to cross-examining Jules about his prior inconsistent statements to the police, defense counsel should have also moved for a new suppression hearing that would have demonstrated that the petitioner was arrested without probable cause.  The petitioner's argument proceeds on the assumption that the police arrested him based solely on Jules's statement to them.  The record reflects otherwise.  At the suppression hearing, a detective testified that he spoke to "Witness #1," who said that he had just parked his car and was walking into his

---

[10]  At the trial, Jules testified that he could not remember the events of the night Augustine was killed.  Outside the presence of the jury, the trial court admonished Jules based on inconsistent statements he had made to the police after the shooting apparently identifying the petitioner as the shooter.  After that, Jules again maintained the petitioner had left the group at the time the shots when off.  Berger Aff. in Response to *Coram Nobis* Applic., Aug. 11, 2009, ¶¶ 8-10; Tr. at 176-96.

building when he saw a group of kids he knew from the neighborhood, and witnessed the petitioner, who he knew by name, shoot one of the other individuals. This witness then selected the petitioner's photograph from an array of pictures, identifying him by name. Minutes of Suppression Hearing Before Justice Robert J. Collini, at 6-9 (Feb. 7, 2006). The context of the testimony at the suppression hearing as well as the later trial testimony demonstrates that Witness #1 was Timothy Gladney, a manager of group homes for the elderly who lived nearby, not Stevenson Jules. (Tr. 222, 224, 234-38, 243-45). Thus, despite any inconsistency in Jules's testimony, there is no meritorious argument for a claim that trial counsel was ineffective for failing to move to reopen a hearing that would not have been successful.

Nor has the petitioner established that the failure to consider his amendments to the Petition would result in a fundamental miscarriage of justice because he has not demonstrated that the basis for his amended petition would have affected the outcome of his trial. *See Aparicio*, 269 F.3d at 90 (to show that a fundamental miscarriage of justice occurred, a petitioner must demonstrate that he is "actually innocent"); *see also Murden v. Artuz*, 497 F.3d 178, 194 (2d Cir. 2007) ("To demonstrate actual innocence a habeas petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence . . . . Actual innocence requires not legal innocence but factual innocence") (internal quotation marks and citations omitted). In assessing this claim, the court notes that "in the habeas context, strategic choices by appellate counsel, such as deciding which issues to raise on appeal, made after thorough investigation of the law and facts, are virtually unchallengeable." *Ortiz*, 2011 WL 1331509, at *9 (quoting *Brunson v. Tracy*, 378 F. Supp. 2d 100, 112 (E.D.N.Y. 2005)). As discussed above, the petitioner's bases for

his ineffective assistance claims are without merit and therefore would not have affected the outcome of his trial.  Therefore, the motion to amend should be denied.

## CONCLUSION

For the reasons stated above, the court respectfully recommends that the petition for a writ of habeas corpus and the other relief requested be DENIED.

\*          \*          \*          \*          \*          \*

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 14 days of receipt of this report.  Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see, e.g., Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010);  *Frank v. Johnson*, 968 F.2d 298 (2d Cir.), *cert. denied*, 113 S. Ct. 825 (1992).

Respectfully recommended,

*Viktor V. Pohorelsky*

VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated: Brooklyn, New York
     February 24, 2012